**MATTHEW C. ELLIS, OSB No. 075800**
matthew@employmentlawpdx.com
**Matthew C. Ellis, PC**
1500 SW First Avenue, Ste 1000
Portland OR 97201
Telephone: 503/345-5407

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| **ADDISON BELLM,** an individual,<br><br>Plaintiff,<br><br>v.<br><br>**LANE COMMUNITY COLLEGE,** an Oregon Public Community College, and **JOSHUA MARTIN,** an individual.<br><br>Defendants. | **CASE NO.**<br><br>**COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS**<br><br>**Jury Trial Demand** |

## I. JURISDICTION AND VENUE

1. This is an action for damages Title IX of the Civil Rights Act of 1972 and 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3)-(4). This court has supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1367. Both federal and state law claims alleged herein arose from a common nucleus of operative facts, and the state claims are so related to the federal claims that they form part of the same case or controversy such that the actions would ordinarily be expected to be tried in one judicial proceeding.

2. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2). Defendants both reside in this District and the events giving rise to this Complaint occurred in Lane County,



MATTHEW C. ELLIS, PC
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

Oregon. Defendant Lane Community College ("hereinafter "LCC") is engaged in regular sustained business activities, including the operation of public community college in Lane County, and Defendant Martin also resides in Lane County, Oregon.

**II. PARTIES**

3. Plaintiff Addison Bellm is a citizen of the United States and a resident of the State of Oregon. Plaintiff was, at all material times, a student athlete for Defendant LCC and coached by Defendant Martin.

4. Defendant LCC is engaged in regular sustained business activities, including the operation of public community college in Lane County, Oregon.

5. Defendant Martin was an employee of LCC at all material times and Plaintiff's soccer coach. Defendant has also been known to go by the following names: Mark Jones, Joshua Marhar, Joshwa Margar. However, he mostly goes by the name Joshwa Martin which, on information and belief, is not his legal name. Because Plaintiff is unaware of Defendant Martin's true legal name and identity, Plaintiff reserves her right to amend the complaint to properly name Martin once discovery takes place.

**III. FACTUAL ALLEGATIONS**

6. Addison Bellm was heavily recruited out of high school by Defendant Martin to play soccer for Defendant LCC. As she finished high school, Defendant Martin called and texted Plaintiff at all hours of the day and night to try to convince her to come to Defendant LCC. Coach Martin made promises that he would provide a springboard to the next level of college soccer and beyond. After being heavily recruited for months and dozens of texts messages or calls to both Bellm and her mother, Bellm agreed to play for Martin and enroll part time at LCC, while she enrolled full time at the University of Oregon. Despite receiving other offers to play soccer around the country, she enrolled at LCC to play soccer at LCC in the 2024-2025 season based on Coach Martin's overtures.

7. Bellm played soccer for Martin as a freshman in the 2024-2025 school year and excelled. Martin told Bellm that the LCC team would be built around her and that it was certain



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

that she would be NWAC player of the year. He told her, under his guidance, she was destined for the US Women's National Team and how he couldn't wait to be there for her professional debut. Bellm was a star player, a top goal scorer, and started 14 of 16 games as a freshman.

8. Martin made-up fictional awards to give to Bellm, consistent with his grooming of Bellm. For example, he posted on the LCC Instagram page in November 2024 that Bellm had received All Region Honors. The award was fraudulent and designed to show Bellm and others that her trust in him was paying off and resulting in recognition by her peers.




9. Martin was a tyrant. Many women on the team, and their families, spoke out against Martin's overly aggressive and inappropriate sex-based coaching style, which bordered on abuse, and suffering retaliation for those reports. For example, players complained that that they were not given tuition funds as promised after opposing mistreatment by Martin; a fact raised to Defendant LCC's Athletic Director, Greg Sheley, but which was not satisfactorily addressed. Other players were kicked off the team after speaking up and opposing Martin.

10. During the 2024-2025 year, at least one complaint of sex discrimination and mistreatment by Martin was presented to Athletic Director Sheley. However, the complaints were disregarded and not seriously investigated.



MATTHEW C. ELLIS, PC
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

11. After the Complaints were made, Martin cornered the team about the discrimination complaint and questioned them about who had filed it, openly deriding those he thought were behind it. He told players that he could take away scholarships both present and retroactively from the past, if he so desired. Consistent with his retaliatory and mercurial temper, anonymous letters were sent to Sheley and Martin by other players but were not investigated, even though Title IX discrimination complaints can be made anonymously. Further, an assistant coach, who had opposed Martin's tyrannical style and treatment of the young women in the program, left the program out of fear of being associated too closely with Martin. The assistant coach voiced serious concerns about the treatment of players by Martin, his devaluing of players, discrimination, making players feel inadequate, and his abusive and controlling tactics.

12. During the 2024-2025 school year, Martin put the girls at serious risk. When he drove them to games, he often would speed excessively, often driving over 90 mph. On one occasion, while driving to a game, he pulled out a laptop to show the girls something on it while driving at the same time, sometimes steering with his knees.

13. Martin's control of his players spilled over into off hours. For example, he required players to let him track them using the "Find My" function on his iPhone, so he knew where they were at all hours. He could see where they were in the middle night, if they were together, and where they were during the school day. After the 2024-2025 school year, only six of the 14 freshmen on the team returned to the team; with many quitting competitive soccer altogether.

14. Martin's mercurial style had an overt sex-based element to it. Martin followed players, and their boyfriends and girlfriends, on Instagram, inappropriately invading their personal lives. He would deride the women on the team because of their menstrual cycle; something he found as a sign of weakness and an inconvenience for him as their coach. He even required the team to report information about their menstrual cycle on google document and would make coaching decisions based on the information, including who would play and how he



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

would coach the games. On one occasion, after a tie game against Rogue CC, Martin shamed the team, blaming their menstrual cycles on negatively impacting their play.

15. In the winter of 2024-2025, when soccer at LCC was over, Bellm continued her studies at the UO full time. Then, in the spring of 2025, Bellm made the UO soccer team as a walk-on. This was a significant development in her career because the team is quite small, exclusive, and is made mostly of students from out of state who are recruited and provided full scholarships. Martin started attending her UO practices, watching from behind the fence. Then, after practice, he would text Bellm and provide additional coaching and feedback; conduct Bellm found creepy and odd. Unfortunately, after a few months, Bellm was released from the UO team because of an injury and returned to LCC in the Summer of 2025 to play soccer for Martin, again.

16. Bellm's brief stint on the UO team reinforced how unorthodox, abusive, and inappropriate Martin's coaching was from the prior year. This year, she vowed to stand up for herself and her teammates and to help make LCC the kind of place that is healthy and positive for the female student athletes at the school. She decided that she would have a voice, even though she knew Martin might bristle at women who stood up for themselves and others.

17. Upon her return to the team in 2025, Martin's grooming of Bellm continued and ramped up, aggressively. While he continued to text and call Bellm at all hours, he was much more aggressive in his interactions. He informed Bellm that she was required to attend specific mandatory practices, only to find afterward that the practices were not mandatory for everyone, only her. Others on the team noticed the new focus on Bellm and asked why Martin was so focused on Bellm. He denied any different treatment.

18. Martin also had students report earlier than was permitted per league regulations and also required them to do work for LCC without compensation. For example, he required all students to report to practice by July 14, 2025, and start practice early even though NWAC rules prohibited mandatory practices at that time. He also required them to work at the Lane County Fair on July 23-25 and 26-27 and also on July 31-August 3 at the UO track meet. These were



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

paid positions, paying $20 per hour for an eight-hour day for ten days. However, the students were never paid for the work. On one occasion, Bellm needed to switch one of her unpaid shifts for a personal matter, at the last minute. Martin was furious. Martin  contacted Bellm's mother and told her that Bellm was not performing well, that others were better than her, that she might not be playing this year at all, but to keep it a secret from Bellm.

19. The week of July 20, 2025, was the first week of preseason. On that day, Bellm attended a mandatory film session with the team and Martin, which lasted three hours. The session was confusing and Martin's instructions and coaching were hard to follow. At the end, Bellm spoke up. She indicated that the hours of information presented was going to be difficult to retain in one day and that the freshman, for whom this was their first week, might have a hard time.

20. Martin was furious. He was not used to Bellm disagreeing with him, even over a fairly minor point. Martin proceeded to belittle Bellm in front of the team for ten minutes. He screamed at her and belittled her while tears streamed down her face. Bellm was confused and upset since his reaction seemed disproportionate to her comment. Afterward, her teammates consoled her and thanked her for her comment.

21. Martin wouldn't let it go. He wanted women on the team who would be seen but not heard. That same day, Martin contacted Bellm to admonish her further for speaking up and suggested she leave the program if she can't keep quiet or if she does "anything even resembling a repeat of that."






**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

22. When they finally spoke in person, he accused her of being a "bad seed" for pushing back on her during his meeting. From that time forward, Martin's ostracization of Bellm increased. Instead of his constant texts and calls, he ignored her and ostracized her. He also let her know she would not be playing at all if she continued to oppose him, in any way. Having a woman on his team with guts to speak her mind was inconsistent with his plan.

23. Martin continued to disregard and minimize safety concerns. On August 8, 2025, Bellm attended an inter-squad scrimmage. Despite the fact that she was nearly always in the starting lineup, she was told that she could not play. Then, on August 13th, 2025, the team played in the game in the Bay Area. There were a number of injuries during the game, and one LCC player had to be taken away in an ambulance. Martin joked about this, referred to the EMTs as "hot," and commented how the injured player was "so lucky to go with the hot EMTs." Martin also made the team pray for her, an inappropriate request for a public school. After the game, Martin yelled at the team for their performance and questioned why they could not follow his instructions. He turned to Bellm, asking if his instructions were clear to her, even though she barely played in the game. Bellm told that they were not, again opposing him. Martin stormed off, furious.

24. As before, Martin's conduct driving to and from the game in the Bay area was alarming. On the way there, Bellm was in Martin's van. While driving, he texted and often exceeded 95 miles per hour with 12 young women in the back of the van. On the way back from the trip from the Bay Area, Martin drove at 93 miles an hour while texting at the same time. Fortunately, the team arrived safely back at LCC that day. The girls were frightened and concerned, especially because this driving incident was just a few months after a tragedy at Umpqua Community College where numerous players and a coach were killed returning from a softball game. Many reported this conduct to the parents, and LCC was also informed of this reckless and illegal behavior.

25. Martin's fury about Bellm's mild comment at the end of the game in the Bay area spilled over into the next week. On August 15, 2025, Martin informed Bellm that he was



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

considering kicking her off the team because of her comment during the trip, but that his assistant coach, Jamie, had convinced him not to do so, yet. He told Bellm that she had become a negative influence on the team and that she needed to act more like a captain. He said that in order to be brought back into the fold, she would need to sign a contract and that, if she broke it, she would be kicked off, permanently. Bellm sobbed and did not attend practice for the rest of the day.

26. On August 17, 2025, Coach Jamie met with Bellm, at Martin's direction, about the contract. Jamie admitted that Martin was treating her much worse than everyone else on the team and that he didn't know why. Regardless, Jamie sent her the contract per Martin's request. The contract included vague, subjective terms that were consistent with sex stereotypes and his desire to only coach women who didn't speak up and followed his lead, absolutely. It required her to "show humility by recognizing you may not know as much as you think you do," "Place team success above personal interest," "Don't be selfish," and stated that "Negative body language, excuses, gossip, or public dissent will not be tolerated," and "Be an energy giver, not an energy killer." The critiques were consistent with sex stereotypes for women, essentially requiring that she be humble, docile, unselfish, that she "doesn't know as much as she thinks", and that she shouldn't dissent, be negative, or gossip. He wanted women without spines, voices, or opinions and would cut down anyone who got in his way. The last thing he needed was an outspoken woman, even though Bellm's manner of speaking out was modest and highly appropriate. Clearly any dissent, even modest pushback, would not stand. The fact it came from a team captain like Bellm—who was supposed to be a leader on the team—didn't matter at all. Martin wanted to coach sheep, not strong women.

27. Bellm's teammates thought the contract was bizarre and told Bellm not sign it. They wanted her to continue to stand up for them, since they didn't feel comfortable doing it on their own. They, and she, saw the contract as an abusive way to exert power and authority over strong women, like Bellm, and require them to submit. Ultimately, Bellm told Jamie she was open to talking about the concerns raised but that she would not sign such a subjective, vague,



MATTHEW C. ELLIS, PC
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

and one-sided contract, especially if male coaches, like Martin, were not subject to the same standards.

28. On August 20, 2025, during a NWAC friendly match in Salem, LCC played a game against Lower Columbia. Bellm played for about ten minutes. After the game, Martin requested a private conversation Bellm and her mother. He told them that if Bellm wanted to play more, she had to do three things: not foul anyone, trust him, and play one-to-two touch. Initially, Bellm was encouraged that Martin seemed to back down from the discriminatory contract requirement and agreed. Bellm's mother opposed Martin. She raised concerns about his coaching style, which she found abusive, his reckless driving that put players at severe risk and his mistreatment of the female student-athletes. Bellm's mother, frustrated, said she would contact the Athletic Director to discuss the matter further and the meeting ended. She did so, and a meeting was set up for September 10[t], 2025

29. On September 10, 2025, after the morning film session, Martin told Bellm that she was removed from the team, effectively immediately. When Bellm asked if she was still permitted to meet with the Athletic Director later that day, Martin said, that he didn't know if the meeting would take place since she was no longer on the team.

30. Bellm and her mother did meet with Athletic Director Sheley on September 10, 2025. Bellm's mother started the meeting and stated that she had concerns that implicated Title IX, a federal law that prohibits sex discrimination, and that her concerns should be brought to the NWAC board, and to SafeSport, a national center that promoted working for a world of youth sports that was free of emotional, physical and sexual abuse and misconduct. As she finished her sentence, Athletic Director Sheley promptly informed them that the meeting was over, effective immediately. Bellm asked to be able to let her read her prepared notes and be heard. Sheley refused to permit her to do so, silencing her, and ushered them out of the room.

31. Even after she was kicked off the team on September 10, Martin's misconduct toward Bellm continued. On September 13, 2025, Bellm attended a game with her old LCC team. Even though she had been kicked off the team, she wanted to support her fellow players. After



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

the game, Martin's wife, Christine, aggressively approached Bellm in the parking lot and lashed out at her, yelling “Is there anything you’d like to say to my face?” Bellm was frightened and had no idea what to say. Bellm responded, “I don’t think this appropriate” and walked away. Bellm heard Christine running after her. Christine got in Bellm’s face, yelling “We are still happily married by the way!” and stormed off.

32. Bellm was scared. She didn’t understand why she would say this to her. While she found Martin misogynistic, sexist and creepy in his whiplash style of coaching and communicating, there was never any indication to her that his interest in her was romantic, nor her in him. Bellm reported the incident that same day to Sheley.

33. As a direct and proximate result of Defendants’ violations of Plaintiff’s rights, Plaintiff has suffered economic loss including out-of-pocket financial losses, tuition refunds, and lost wages or educational opportunities because of LCC’s discrimination and expulsion from the soccer team.

34. As a direct and proximate result of Defendants’ violations of Plaintiff’s rights, Plaintiff has suffered emotional distress, mental anguish and loss of self-esteem and dignity.

35. Defendant Martin’s conduct was carried out with wanton or reckless disregard for Plaintiff’s civil rights. Punitive damages should be assessed against Defendant Martin to deter him and individuals like him from such conduct in the future.

36. Plaintiff is entitled to reasonable attorney fees and costs, including expert witness costs, pursuant to 42 U.S.C. § 1988, ORS 659A.885, ORS 20.107 and ORS 659.860.

37. On February 3, 2026, Plaintiff provided LCC with a notice of tort claim under ORS 30.275 based on the facts set forth above and a grievance pertaining to discrimination and retaliation under Title IX and ORS 659.850-860.

/ / /

/ / /

/ / /



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

**FIRST CLAIM FOR RELIEF**
42 U.S.C. § 1681; Title IX of the Education Amendments Act of 1972
(Against Defendant LCC)

38. Plaintiff realleges 1-33, 36 and 37 and incorporates the same herein.

39. At all material times, Defendant LCC was a public education institution that received Federal financial assistance.

40. Defendant LCC excluded Plaintiff from participation in, denied the benefit of, or subjected Plaintiff to discrimination under its education program or activities receiving Federal financial assistance in violation of 42 U.S.C. §1681(a) by excluding her from the soccer team and subjecting her to a sex-based environment of hostility. This included grooming Plaintiff in bad faith, removing her from the soccer team, and subjecting Plaintiff to a hostile environment because of her sex, including her failure to comply with sex stereotypes. This also included retaliation against Plaintiff and her mother for opposing discrimination and failing to take reasonable steps to stop the harassing, unwarranted and stereotypical treatment of Plaintiff. This conduct alleged herein violates 42 U.S.C. §1681(a) as interpreted by 34 C.F.R. §106.71.

**SECOND CLAIM FOR RELIEF**
42 U.S.C. §1983- Violations of Equal Protection Clause of the United States Constitution
(Against all Defendants)

41. Plaintiff realleges paragraphs 1-37 above and incorporates them herein.

42. Defendant Martin deprived plaintiff of her Fourteenth Amendment right to be free of sex discrimination by forcing her removal from the soccer team because of her sex and for her failure to conform to sex stereotypes regarding women. These stereotypes included stereotypes about strong women who oppose male authority figures and who oppose unsafe and illegal practices of Defendant Martin. Likewise, Defendant Martin deprived Plaintiff of her Fourteenth Amendment right to be free of sex discrimination by subjecting Plaintiff to a hostile environment because of her sex, and by failing to take reasonable steps to stop the harassing, unwarranted and



MATTHEW C. ELLIS, PC
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

stereotypical treatment of Plaintiff.

43. Defendant LCC is liable for the deprivation of Plaintiff's Fourteenth Amendment rights because the deprivation was pursuant to an LCC custom, policy or practice of having a double standard as it pertains to sex, of ignoring complaints by female student athletes and of retaliating and belittling women who are perceived as not conforming with sex stereotypes. Also, the deprivation was pursuant to an LCC custom, policy or practice of having an ineffective complaint mechanism that permits continued discrimination and retaliation against individuals who make complaints.

44. At all material times, Athletic Director Greg Sheley had final policymaking authority and engaged in the acts alleged herein while acting as a final policymaker for the LCC Athletic Department. As a result, Defendant LCC is liable for the deprivation of Plaintiff's Fourteenth Amendment rights because the unlawful decisions were made or approved by persons in policymaking positions for Defendant LCC.

45. Defendant LCC is also liable for the deprivation of Plaintiff's Fourteenth Amendment rights because persons in policymaking positions specifically ratified the unlawful conduct alleged herein knowing the basis of the unlawful conduct.

**THIRD CLAIM FOR RELIEF**

42 U.S.C. §1983- Violations of First Amendment of the United States Constitution
(Against all Defendants)

46. Plaintiff realleges paragraphs 1-37 above and incorporates them herein.

47. Defendant Martin deprived Plaintiff of her rights of freedom of speech, her rights to petition the government for redress of her grievances her right of freedom of association by removing Plaintiff from the soccer team and belittling her and creating a hostile environment for her for her opposition to his abusive and sexually inappropriate coaching style, her opposition to his unsafe driving practices which needless put Plaintiff and her classmates in serious risk of harm. Plaintiff's acts of opposing this conduct constituted speech as a matter of public concern.



MATTHEW C. ELLIS, PC
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

Had Plaintiff not opposed Martin in this regard, she would not have been removed from the soccer team.

48. Defendant LCC is liable for the deprivation of Plaintiff's Fourteenth Amendment rights because the deprivation was pursuant to an LCC custom, policy or practice of having a double standard as it pertains to sex, of ignoring complaints by female student athletes and of retaliating and belittling women who are perceived as not conforming with sex stereotypes. Also, the deprivation was pursuant to an LCC custom, policy or practice of having an ineffective complaint mechanism that permits continued discrimination and retaliation against individuals who make complaints.

49. At all material times, Athletic Director Greg Sheley had final policymaking authority and engaged in the acts alleged herein while acting as a final policymaker for the LCC Athletic Department. As a result, Defendant LCC is liable for the deprivation of Plaintiff's Fourteenth Amendment rights because the unlawful decisions were made or approved by persons in policymaking positions for Defendant LCC.

50. Defendant LCC is also liable for the deprivation of Plaintiff's Fourteenth Amendment rights because persons in policymaking positions specifically ratified the unlawful conduct alleged herein knowing the basis of the unlawful conduct.

**FOURTH CLAIM FOR RELIEF**
O.R.S. 659.850(2)
(Against Defendant LCC)

51. Plaintiff realleges 1-33, 36 and 37 and incorporates the same herein.

52. Defendant LCC is financed in part by moneys appropriated by the Legislative Assembly.

53. Defendant violated ORS 659.850(2) by subjecting Plaintiff to sex-based discrimination by subjecting her to a sex-based hostile environment, by treating her differently because of her sex and for failing to conform with sex stereotypes. This conduct resulted in her



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

removal from the LCC soccer team because of her sex.

**FIFTH CLAIM FOR RELIEF**
O.R.S. 659.852
(Against Defendant LCC)

54. Plaintiff realleges 1-34, 36 and 37 and incorporates the same herein.

55. Defendant LCC is an education program for purposes of ORS 659.852 because it is a community college operated under ORS chapter 341.

56. Defendant LCC retaliated against Plaintiff by removing her from the soccer team because she and her mother in good faith reported information that Defendant violated a state or federal law, rule or regulation including laws and regulations prohibiting sex discrimination in education, and safe driving rules and regulations.

**WHEREFORE**, Plaintiff requests a trial by jury and requests the Court should grant judgment in favor of Plaintiff and against Defendant and grant the following relief:

1. On all Plaintiff's Claims for Relief, an award of damages for economic loss and an award of attorney fees, costs and disbursements; and any such further or alternative relief in favor of Plaintiff as the Court deems appropriate.

2. On Plaintiff's Second, Third and Fifth Claims for Relief, an award of damages for emotional distress;

3. On Plaintiff's Second and Third Claims for Relief, an award of punitive damages against Defendant Martin.

DATED this 27th day of August, 2026.



**MATTHEW C. ELLIS, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: (503) 345-5497

By /s Matthew C Ellis
**MATTHEW C. ELLIS, OSB No. 075800**
Matthew C. Ellis, PC
1500 SW First Avenue, Suite 1000
Portland, OR 97201
503/345-5497
matthew@employmentlawpdx.com

Plaintiff demands a trial by jury.

By s/Matthew C. Ellis
**MATTHEW C. ELLIS**
OSB No. 075800
(503) 345-5497